UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SALVATORE PRESUTTI,                    :
                                       :
        Plaintiff,                     :
                                       :
v.                                     :    No. 3:98CV1978(DJS)
                                       :
CITY OF NEW BRITAIN; WILLIAM           :
J. McNAMARA; OREST T. DUBNO;           :
AIME BROCHU; DONALD DeFRONZO;          :
THEODORE FUSARO; RICHARD A.            :
HARALL; JOHN PAPANDREA;                :
ANTHONY MILANO; WILLIAM CIBES;         :
HENRY S. SCHERER, JR.; PAUL            :
PERNEREWSKI; LAWRENCE M.               :
LUSARDI; ANN MARIE KLIMEK;             :
LINDA BLOGOSLASKI; DAN DILZER;         :
HUDSON BIRDEN, JR.; and ANITA          :
COBB;                                  :
                                       :
        Defendants.                    :

MEMORANDUM OF DECISION

    Plaintiff Salvatore Presutti brings this action against the

following defendants[1] alleging deprivation of his property and

_____

    [1] This list of defendants is taken from plaintiff's Amended
Complaint (dkt. # 92).  Mary O'Loughlin, who was not listed as a
defendant in the official caption of this case, and Dan Dilzer
have been dismissed from this lawsuit in prior orders from this
court.  Some other persons and entities are listed on the court's
docket sheet as defendants by virtue of plaintiff's original
complaint, but plaintiff has waived his claims against these
former defendants by not listing them as defendants in his
Amended Complaint or incorporating the original complaint by
reference into the Amended Complaint.  See Harris v. City of New
York, 186 F.3d 243, 250 (2d Cir. 1999); Shields v. Citytrust
Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well
established that an amended complaint ordinarily supersedes the
original, and renders it of no legal effect.") (citing
International Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir.
1977), cert. denied, 434 U.S. 1014 (1978)).

conspiracy to deprive him of his property without due process of law and just compensation in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution by way of 42 U.S.C. §§ 1983 and 1985.[2]  The first group of defendants, the City defendants, includes the City of New Britain and the following persons: William McNamara (1977 to 1989), Donald DeFronzo (1989 to 1993), and Linda Blogoslawski (1993 to 1995), former Mayors of the City of New Britain; Aime Brochu, former Executive Director (July 11, 1977 to December 31, 1992) of the New Britain Housing Site Development Agency[3] ("HSDA"); Anne Marie Klimek, former Executive Director (January 1, 1993 to December 19, 1994) of the Commission on Community and Neighborhood Development for the City of New Britain, formerly the HSDA; Theodore Fusaro, former Interim Director (December 19, 1994 to April 5, 1995) and Executive Director (April 6, 1995 to February 2, 1996) of the Commission on Community and Neighborhood Development; Anita Cobb, Assistant Corporation Counsel for the

---

[2] This court has already presumed that Presutti has alleged a conspiracy claim pursuant to 42 U.S.C. § 1985, and now finds that this claim has been alleged.  (See Dkt. # 92 ¶ 50.)

[3] This agency was known by the following names during Brochu's tenure: New Britain Redevelopment Commission, City Improvement Commission, Housing Site Development Agency, and Commission on Community and Neighborhood Development of the City of New Britain.  Brochu states that the name of the agency during the Beaver Street project at issue in this case was the Housing Site Development Agency, and the court will refer to it as such throughout this memorandum.

City of New Britain (January 20, 1983 to July 31, 1998); Hudson
Birden, Jr., former Director of Health for the City of New
Britain (May 11, 1993 to December 31, 2002); and Richard Harrall,
a former employee of a firm that provided consulting services to
the City of New Britain.  The second group of defendants, the
State defendants, includes the following persons: John Papandrea
(until March of 1991) and Henry Scherer, Jr. (March 1991 to March
1995), former Commissioners of the State of Connecticut
Department of Housing ("DOH"), which is now known as the
Department of Economic and Community Development ("DECD");
Anthony Milano (until March of 1991) and William Cibes (March
1991 to March 1995), former Secretaries to the State of
Connecticut Office of Policy and Management ("OPM"); Lawrence
Lusardi, former Director of the Community Development Division at
DOH (1991 to 1995), and current DECD employee; David Martin,[4]
former DOH employee; and Paul Pernerewski, State of Connecticut
Assistant Attorney General.  Orest Dubno, former Executive
Director of the Connecticut Housing Finance Authority ("CHFA")
(February of 1985 to March of 1992), was an employee of the
State, but has obtained his own representation for this matter.
The above-named individuals are sued in their individual

---

[4] Although Martin is not listed in the caption of the
Amended Complaint, he is named as a defendant in the text of the
Amended Complaint (see dkt. # 92 ¶¶ 99-103, 106), was served with
a copy of the original complaint in his individual capacity (see
dkt. # 63), and is represented by counsel.

capacities.  The State defendants (Cibes, Fusaro, Lusardi,
Milano, Papandrea, Pernerewski, Martin, and Scherer) (dkt. #
170), the City defendants (McNamara, Brochu, DeFronzo, Fusaro,
Harrall, Klimek, Blogoslawski, Birden, and Cobb) (dkt. # 167),
and Dubno (dkt. # 163) filed motions for summary judgment
pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.
For the reasons set forth herein, these motions are **GRANTED.**

### I. FACTS

     This case concerns Presutti's involvement in an urban
renewal project undertaken by the City of New Britain ("the
City").  Presutti was, at various times, employed as a real
estate developer beginning in the mid 1970's through the events
relevant to this lawsuit.  In 1983, Presutti and Mark Gerrity,
then his business partner, began discussions with the City of New
Britain regarding a redevelopment project; shortly thereafter,
Presutti began acquiring property located within the area
identified for redevelopment.  Presutti claims that, shortly
after he began acquiring property, he determined that his
original plans were not economically feasible, but that he
nevertheless reconsidered and moved forward with his plans at the
urging of City officials.

     The subject of Presutti's discussions with the City became
known as the Beaver Street Housing Site Development Area ("Beaver
Street Project").  The New Britain Housing Site Development

Agency ("HSDA") planned to acquire land for the purpose of rehabilitating existing structures and constructing new structures to be used primarily for low to moderate income housing.  The targeted land consisted of four parcels:  Parcel 1 consisted of 26, 30-32, 38, 40 & 42 Beaver Street; Parcel 2 consisted of 48-48R, 54, 56, 58, 64 & 70 Beaver Street; Parcel 3 consisted of 59 & 67 Beaver Street and 690 Main Street; and Parcel 4 consisted of 49 Beaver Street.  The Beaver Street Project area also included 53-53R Beaver Street and 41 Beaver Street, which was also known as St. Mary's School.  Parcels 1 and 2 were located on the West side of Beaver Street, while Parcels 3 and 4, 53-53R, and St. Mary's School were located on the East side of Beaver Street.

Presutti owned five properties within the Beaver Street Project.  Through limited partnerships and corporate entities, Presutti owned half of Parcel 1 (26, 30-32 Beaver Street); a portion of Parcel 3 (690 Main Street); as well as 53-53R Beaver Street and St. Mary's School (41 Beaver Street).  Presutti also owned Lot B, also known as Parcel 2 of the Lafayette Street Improvement Area, which was a vacant lot adjacent to Parcel 1 of the Beaver Street Project on the West side of Beaver Street and was located at the corner of Lafayette and Beaver Streets.  Presutti has not individually owned this property since 1989, and the limited partnerships or corporate entities in which Presutti

-5-

had an interest did not own any property within the Beaver Street Project as of 1992.

The City sought and obtained substantial financial aid from the State of Connecticut for the purpose of undertaking the Beaver Street Project.  On August 22, 1988, the HSDA filed an application for a Housing Site Development grant ("HSD grant") for the Beaver Street Project with the State of Connecticut Department of Housing ("DOH").   The HSD grant request was in the amount of $1,624,188 for site acquisition and improvements for the Beaver Street project.  On September 23, 1988, the Bond Commission of the State of Connecticut approved the New Britain Housing Site Development Agency's application for a HSD grant, and awarded New Britain $1,624,188 for the Beaver Street project. The entire award had been dispersed to the City as of August 2, 1991.

After requesting proposals to develop Beaver Street, by way of a resolution dated November 3, 1988, the HSDA designated Presutti preferred developer for Parcels 1 and 4 of the Beaver Street Project, and Communidad en Acción, Inc. as preferred developer for Parcels 2 and 3 of the Beaver Street Project.  The November 3, 1988 Resolution passed by the HSDA required that Presutti and Communidad en Acción "provide evidence of financing commitments in a form satisfactory to the Agency within six (6) months of the date of the resolution."  (Dkt. # 174 Ex. 14 at 2.)

The November 3, 1988 Resolution further provided that, "[i]f such commitments are not provided at the end of this six (6) month period, the Agency reserves the right to withdraw the designation included herein from any developer not providing such commitment," and that "[u]pon provision of acceptable financing commitments and site plan by developers, the Agency shall enter into a formal disposition agreement."  (Id.)  A disposition agreement constituted a contractual agreement between the City and a developer when the developer submitted evidence of a financing commitment from a lender and site plans.  The HSDA designated Presutti and Communidad en Acción, Inc. as preferred developers in order to provide them with the necessary proof of permission to develop the property from the City so that they could secure their own financing.

Presutti sought a part of the financing required for his portion of the Beaver Street Project from the State.  On or about December 1, 1988, Presutti filed an application with the Connecticut Housing Finance Authority ("CHFA") for financing under the Private Rental Investment Mortgage Equity program ("PRIME").  PRIME was established by statute, see Conn. Gen. Stat. § 8-400 et seq., and permitted the use of State moneys to fund housing developments throughout the State.  Applications were processed by CHFA for underwriting purposes, and then reviewed and approved by the DOH.  Presutti's original

application for PRIME financing proposed rehabilitation of St.
Mary's School as market rate condominiums.

Although he did not secure unconditional approval,
Presutti's application survived preliminary scrutiny.  On March
8, 1989, DOH Commissioner John F. Papandrea informed CHFA that he
concurred with CHFA's staff recommendation that Presutti's
proposal for the Beaver Street Project be financed under PRIME,
contingent upon compliance with CHFA and DOH underwriting
criteria.  On March 21, 1989, CHFA informed Presutti that his
site had been inspected and was approved for development under
PRIME subject to certain conditions.

Later in 1989, Presutti secured State aid in the form of tax
credits from the CHFA.  In December 1989, Central Village Limited
Partnership, with Presutti acting as its agent, was granted 1989
Low Income Housing Tax Credits for the purpose of developing the
Beaver Street properties in the amount of $430,083.  The Low
Income Housing Tax Credit program

> was enacted by Congress in 1986 to provide the private
> market with an incentive to invest in affordable rental
> housing.  Federal housing tax credits are awarded to
> developers of qualified projects.  Developers then sell
> these credits to investors to raise capital (or equity)
> for their projects, which reduces the debt that the
> developer would otherwise have to borrow. . . .
> Provided the property maintains compliance with the
> program requirements, investors receive a dollar-for-
> dollar credit against their Federal tax liability each
> year over a period of ten years.

U.S. Dept. of Housing and Urban Development, HOME and Low Income

-8-

Housing Tax Credits (LIHTC), (last modified Aug. 30, 2004),
http://www.hud.gov/offices/cpd/affordablehousing/training/lihtc/
basics/work.cfm.  Presutti therefore received the right to
collect $4.3 million in tax credits for a ten-year period
commencing in 1989 provided that the property developed met the
requirements of the program during the ten-year period.  The tax
credits had to be used before a date certain or else the right to
use them would be forfeited.

     After he submitted his original application for PRIME
financing, Presutti modified his plan to develop St. Mary's
School.  On or about January 22, 1990, Presutti proposed
development of St. Mary's School as elderly housing, which DOH
opposed.  Both CHFA and the City wrote to Commissioner Papandrea
on behalf of Presutti requesting a change in DOH policy to permit
inclusion of the elderly housing component under PRIME financing,
but Papandrea declined to change his position, and informed
Presutti of his decision by letter dated March 19, 1990.  On
April 20, 1990, Presutti withdrew the elderly housing proposal
from his PRIME application and requested that CHFA consider his
proposal to develop St. Mary's School as an application through
CHFA's market rate program.  On May 3, 1990, Dubno informed
Presutti that CHFA was willing to initiate processing on his St.
Mary's application with the understanding that Presutti would
continue to seek financing for the remainder of his original

-9-

proposal through PRIME.  On August 29, 1990, CHFA issued a Commitment Letter to St. Mary's Residence L.P., Salvatore Presutti general partner, for the redevelopment of St. Mary's School.  The St. Mary's rehabilitation project was referred to as "Phase 1," and the remainder of Presutti's involvement in the redevelopment of Beaver street was referred to as "Phase 2."

Once the project was divided, Presutti devoted much of his focus to completing the rehabilitation of St. Mary's.  Toward this end, Presutti transferred almost all of his tax credits to the St. Mary's rehabilitation project.  On December 11, 1990, Presutti admitted to CHFA that the transfer of feasibility money from Phase 2 to Phase 1 would "compound Phase 2's chance" and that "in these increasingly restrictive times we may not have the ability to replace those funds," but nonetheless affirmed his intention to proceed at his "own risk in order to guarantee the viability of the St. Mary's."  (Dkt. # 174 Ex. 38.)

While he was trying to complete the St. Mary's rehabilitation, Presutti began experiencing difficulty with his PRIME application for Phase 2.  On March 15, 1991, the CHFA informed Presutti that, unless significant progress was made toward completing the necessary documentation for Phase 2, DOH was considering declining his PRIME application.  Both Presutti and CHFA implored DOH to delay its proposed action of terminating the PRIME application until St. Mary's had been completed.

Moreover, CHFA acknowledged that Presutti would require new low income housing tax credits to finance Phase 2, and thus requested an extension until October 1, 1991 so that a new application for these credits could be submitted.  On May 9, 1991, DOH granted Presutti's request, and granted a subsequent request to extend the deadline to February 29, 1992.

Presutti's involvement in the St. Mary's rehabilitation ended in late 1991.  On December 12, 1991, CHFA and the entity that owned St. Mary's School, Central Village L.P., closed on a loan to finance the redevelopment St. Mary's School.  On December 16, 1991, Presutti sold his interest in Central Village L.P.  The Presutti Family Trust received $99,000.00 for expenditures and $199,000.00 for services rendered, and Presutti received $75,000.00 by way of payment directly to his creditors.

At about this time, the City sought additional funds from the DOH.  On or about January 14, 1992, the Community Development Division of the DOH executed an Assistance Agreement with the City to provide a Housing and Community Development ("HCD") grant-in-aid in the amount of $443,932 for the acquisition, site development, and improvement of the Beaver Street Project area. The State bond commission approved funds for this request on February 22, 1992.  A portion of these funds were to be used to reimburse the City for cost overruns.  Section 16(b) of this agreement provides the following:

> [t]he Contractor [,the City,] shall not encumber,
> convey, sell, transfer, or rent any Benefitted Parcels
> for twenty five years without the express written
> consent of the Commissioner.  Such consent may only be
> granted to the extent that the total consideration
> received by the Contractor or the State from such
> encumbrance, conveyance, sale, or transfer does not
> exceed the difference between Gross Project Cost and
> Net Project Cost.  Rental charges for units in any
> building on the Benefitted Parcels shall be permitted
> only to the extent that they cover current operating
> expenses plus any other debt service costs not related
> to this Assistance Agreement and Assistance Agreement
> 089-HSD-3.

(Dkt. # 174 Ex. 48.)  The State interprets this provision as precluding the City or the State from profiting from the sale of parcels of land benefitted by the January 14, 1992 HCD grant or the September 23, 1988 HSD grant.

After completing the St. Mary's project, Presutti was unable to proceed with Phase 2.  After the closing on the St. Mary's loan, Presutti began to receive negative feedback about the prospect of initiating Phase 2 from the City, CHFA, and DOH. According to Presutti, CHFA told him that Phase 2 was in jeopardy because DOH "would never approve [his] PRIME [application] because they felt the marketing conditions had changed and it was never going to rent."  (Dkt. # 166, Presutti Dep. at 208:9-12, see also id. at 213-214.)  On February 5, 1992, Presutti met with Mayor Donald DeFronzo and Brochu and claims he was told "that the City of New Britain was never going to let me develop anything" on Beaver Street and that Presutti should "sell [his] interest, developer and land, to the City" or a nonprofit corporation

-12-

endorsed by the City.  (Id. at 204:14-19.)  On March 10, 1992,

Presutti attended a meeting with representatives of DOH, and

Presutti testified that the following occurred:

> David Martin [of DOH] stood up and said, "Let's put an
> end to this" – paraphrasing – and he said, "Mr.
> Presutti, you're not going to build anything on Beaver
> Street," and both the City and DOH agreed to that and
> there is a written agreement to that effect, because of
> state bonds. He made it very clear right between the
> eyes.  I only added one thing and that was in the
> presence of everybody.  I immediately asked for a
> meeting with the attorney general and I asked for
> access to all files and all documents related to Beaver
> Street from 1997 on.  Mr. Martin told me he would
> report to his superiors and let me know, and the
> meeting ended.

(Dkt. # 166, Presutti Dep. at 158:5-16.)  Presutti took notes at

the March 10, 1992 meeting, which state the following:

> Dave Martin, who was in attendance from DOH, stated an
> "agreement" was signed by the City stating no profit
> whatsoever could be made from what was built on the HSD
> money used for the land purchase.  It was the same land
> I was preferred developer for.  Dave said this was per
> state statute because of tax free bond funds that were
> sold.  I could not be making money on anything built on
> the land even though my development approved by the
> Town did not state this!!  I was moving forward on a
> project that could never have been approved by the
> State Bonding Commission!!!  Dave will review with the
> state A.G.'s office re this question.  He will also
> check on whether I can develop land at all since I am a
> for profit developer which is precluded from developing
> the land I am currently preferred developer for by the
> town.

(Dkt. # 174 Ex. 50.)  Shortly thereafter, Presutti's PRIME

application was terminated.  On March 25, 1992, Mary A.

O'Loughlin of DOH wrote to Presutti, "[p]ursuant to your meeting

with Ms. Faith Bessette, Supervisor, Family Housing Division on

-13-

March 10, 1992, this is to confirm your mutual agreement that the Central Village PRIME proposal is terminated and has been placed in our files as an inactive project." (Dkt. # 174 Ex. 51.)

Apparently, Presutti tried to obtain alternate financing, but was ultimately unsuccessful. O'Loughlin stated that she understood that Presutti was seeking alternate financing, and she offered DOH's commendation for Presutti's committment to build affordable housing. (See id.) On March 31, 1992, Martha Close of CHFA responded to Presutti's request for information regarding other funding programs that might be available to the Beaver Street project. Presutti wrote Ms. Close because he was "inquiring about any method in which I could finish my development, knowing that PRIME was never going to happen for me." (Dkt. # 166, Presutti Dep. at 163:18-20.) On April 23, 1992, Presutti wrote to Mayor DeFronzo and requested a meeting regarding options for developing the remainder of Beaver Street. Ultimately, despite retaining his preferred developer designation, Presutti never entered into a disposition agreement with the City and did not retain any interest in the subject properties beyond 1992.

Not only was he not able to complete his development plans, 53 Beaver Street became the subject of an environmental investigation. On June 5, 1995, the Commissioner of the Department of Environmental Protection ("DEP") issued an order to

Daniel Parker, Presutti's brother-in-law and then-owner of the parcel, alleging that more than ten cubic yards of solid waste had been disposed of without a permit on the property located at 53 Beaver Street and requiring Parker to remove the solid waste. After an appeal, the order was affirmed, and the DEP brought an action in Connecticut Superior Court to enforce the order. During these proceedings, Presutti alleged that the City and the State were responsible for the presence of the waste on the property.  On June 12, 1997, a stipulated judgment was entered in the enforcement action, and Parker was required to pay a fine. Parker conveyed the property to the City on June 10, 1997.

Presutti alleges that his inability to obtain state financing, and his inability to develop his land irrespective of his source of financing, was the result of a concerted effort on the part of the City, CHFA, and the State to cause Presutti to fail.  He contends that defendants took these actions in order to preserve the tax exempt status of an entire issue of State bonds, which would have been forfeited if Presutti had been permitted to execute his development plan.  He posits that, once defendants realized that Presutti's involvement jeopardized the tax-exempt status of an entire bond issue, they knew Presutti could no longer be involved in the project.  Presutti claims that, rather than acknowledging their original error and taking his property with fair compensation, defendants opted to force him out of the

-15-

project without compensation.

Following the failure of his redevelopment plans, Presutti
contemplated legal action against those he deemed responsible.
On or about January 5, 1993, Presutti retained the firm of
Kroopnick & Klemonski to assist him in a claim against the City
of New Britain for reimbursement for public improvements done at
St. Mary's School, thus sparking a series of letters between his
counsel and the City.  On October 5, 1993, Presutti forwarded to
Arnold Sbarge, Esq., a document package concerning the matter of
"Salvatore J. Presutti vs. City of New Britain, et al Beaver
Street Development Project."  (Dkt. # 174 Ex. 57.)  Presutti also
told Sbarge that "[b]ecause I was successful at pulling elderly
part out of PRIME, DOH was exposed.  It could not hide behind
total failure of PRIME 'app.'  The rest of PRIME, 120 units
failed, but DOH came right out and told me I could never get the
land needed for this part of project because of the state
statute.  They claimed New Britain knew it all along."  (Dkt. #
166, Presutti Dep. at 260:9-15.)  On November 15, 1993, Presutti
told Attorney Sbarge that "[i]t is interesting that the actions
of both the City and DOH kept me from proceeding with my
development.  But it was DOH who told me that it told the City
that I could never be given the land required for the development
because I was not a non-profit.  Of course, the City changes
parking requirement from ½ to 2 spaces only delay the truth from

coming out."  (Dkt. # 174 Ex. 59.)

On December 17, 1993, Presutti forwarded to Attorney Sbarge a September 24, 1993 letter from Mayor DeFronzo to Lawrence Lusardi of DOH regarding the status of the Beaver Street project. In his letter, Mayor DeFronzo stated the following:

> I take issue with your representation that "the City promised to submit a plan outlining the future uses of Beaver Street". . . .   You may be unaware of the fact however, that Mr. Presutti owns outright most of the land on Beaver Street.  Quite frankly, his ownership has been an impediment to any planning effort because he maintains, in my opinion, unrealistically high sale values for his property.  In fact following the April 22, 1992 meeting, I met with Mr. Presutti, but his asking price for his properties was in excess of one million dollars.  I am quite confident that neither the state nor the city could justify such an amount. . . . One further point, it was a change in state policy which precluded Mr. Presutti from proceeding with his original plan, a change in which [DOH] only wishes to deal with non-profit developers.  How can the City be held accountable for that?  This is even a more poignant question given the fact that the City does not even own the land.

(Dkt. # 174 Ex. 60.)

In 1996, Presutti was able to prompt Congresswoman Nancy Johnson to inquire of Richard Blumenthal, the State of Connecticut Attorney General, regarding the possibility that the State was involved in causing Presutti's development plans to fail.  In response to the Congresswoman's inquiry, AAG Paul Pernerewski drafted two memoranda to Blumenthal.  In the first memorandum, Pernerewski noted that, upon speaking to Cathy Dempsey at OPM, "Mr. Presutti was listed in the Bond Commission

item as the preferred developer for the project.  However, given

the tax exempt status of the bonds, it was determined that he

could not be the developer.  She said a document to that effect

was sent to the Department of Housing (DOH), although no copy

exists in OPM's files."  (Dkt. # 172 Ex. C.)  In his second

memorandum, Pernerewski concluded that

> Mr. Presutti felt that his portion of the redevelopment
> of the Beaver Street area of New Britain was improperly
> terminated once it was realized that, as a for-profit
> developer, his participation would jeopardize the tax-
> exempt status of bonds that had been issued by the
> State for the acquisition and clean-up of the
> underlying real property.
>
> A review of the development records indicates that is
> not the case.  Rather, Mr. Presutti's project was
> terminated as a result of his continued inability to
> submit necessary information in accordance with
> deadlines which he himself helped to establish.
> Further, the information he did submit did not indicate
> his proposed project was feasible.

(Dkt. # 172 Ex. C.)  Pernerewski noted that "bond counsel, the

law firm of Day, Berry and Howard, had become aware of the

proposed use of the HSD financed sites, and issued a warning on

the proposed tax consequences"; that "the issue was not the

character of the developer, but whether there would be any

recoupment of funds by either DOH or the Housing Site Development

Agency"; and that "[t]he problem was finally resolved to the

satisfaction of bond counsel."  (Id.)

Presutti claims that "[t]he State's problem with its tax

exempt bonds was further complicated because the DOH had executed

a Certificate as to Tax Information Grants to HSDA prior ro
October 1, 1988.  This document, signed by [Richard Confrancesco
of DOH], made it impossible for the DOH to finance Mr. Presutti's
project because it included HSD properties."  (Dkt. # 92 ¶ 49.)
This certificate is also referred to in a letter to Confrancesco
from the State's bond counsel:

> [y]ou will recall executing a certificate . . . in
> March of 1989 concerning the treatment of various
> grants approved by the State Bond Commission under the
> HSD program.  The purpose of the certificate was to
> assure that under no circumstances would the properties
> financed with HSD grants be sold by a grantee Housing
> Site Development Agency at sales prices that would
> allow either the Housing Site Development Agency or DOH
> to recoup any portion of the grant or the Housing Site
> Development Agency's local share [of the grant
> package].

(Dkt. # 186 Ex. 7.)  Presutti further alleges that

> any mortgage payments Mr. Presutti would have to make
> to either State or Local government entities would
> cause a problem.  Moreover, the certificate as to tax
> information grants to housing site development agencies
> required the DOH to maintain an equity position in any
> housing project receiving funds from it as part of its
> participation in the PRIME program.  Therefore, the
> State could not allow the DOH to participate in Mr.
> Presutti's Beaver Street PRIME Project without losing
> the tax exempt status of its bonds.

(Id. ¶ 50.)  Presutti therefore concludes that "[t]he DOH, OPM
and the City concluded that it was the only way to protect the
bonds from the Beaver Street project from collapsing.  It was the
only way for the City to avoid returning money to the State that
it had received and spent."  (Id. ¶ 67.)

    Presutti claims that the City and the State executed their

plans to force Presutti from participating in the Beaver Street Project in a variety of ways. First, Presutti alleges that the City and DOH forced Presutti to allow a non-profit called Communidad en Accion to participate in the Beaver Street Project by developing Parcels 2 and 3. Second, he claims that the City changed its zoning ordinances regarding available parking spaces for housing units shortly after he submitted his development plans, and that efforts, which spanned over a year, to obtain a variance caused serious delays in the project. Third, he claims that the City passed an amendment to the Beaver Street Project Housing Site Development Plan that expressly permitted the HSDA to acquire St. Mary's School and 53 Beaver Street, and that the City actually sought and obtained funding for this amendment from DOH through the January 14, 1992 HCD grant.

Presutti claims that the State, on several occasions, tried to force him out of the project by insisting that the project be undertaken by a non-profit developer. He points to several references throughout the record to DOH's preference that the project be handled by a non-profit developer. He also notes that, on February 25, 1991, a CHFA official opined that

> [t]he delays in processing [Presutti's PRIME application] due to DOH's insistence that the developer joint venture with a nonprofit, have resulted in lost time. Consequently, the developer anticipates the loss of the tax credits for the three new construction buildings [in Phase 2] as they will be unable to 'place in service' by Dec. 31, 1991. The fact that DOH published their policy in midstream has caused the

developer lost time and loss of credits.

(Dkt. # 3 Ex. 44.)

Presutti sued the City on June 20, 1997, in the Connecticut Superior Court, Judicial District of Hartford-New Britain. Presutti's June 20, 1997, complaint contained two counts and involved the sidewalk improvements for the St. Mary's School rehabilitation:  the first count alleged a breach of a contract between the City and Central Village Limited Partnership, and that Presutti was a beneficiary of that contract; the second count alleged unjust enrichment.  The court granted the City's motion dismissing both counts of Presutti's complaint on January 5, 1998.  On November 18, 1999, the court denied Presutti's petition for a new trial and entered judgment for the City.

Presutti filed this lawsuit on October 6, 1998.

## II.  DISCUSSION

Presutti claims that defendants "deprived [him] of property without due process of law and took property [of his], whether actually or constructively, without just compensation" in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution.  Defendants claim that Presutti's claims are barred by the applicable statute of limitations and that his claims must fail because he lacked a cognizable property interest.  Certain individual defendants contend that they should not be held liable because they were not personally involved in the actions

complained of, or that they are entitled to assert the defense of
qualified immunity.

A.   STANDARD

A motion for summary judgment may be granted "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue of material fact and that the
moving party is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(c).  Summary judgment is appropriate if, after
discovery, the nonmoving party "has failed to make a sufficient
showing on an essential element of [its] case with respect to
which [it] has the burden of proof."  Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to
demonstrate the absence of any material factual issue genuinely
in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l
Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v.
Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir.
1975)).  A dispute concerning a material fact is genuine "'if
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist.,
963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all
inferences and ambiguities in a light most favorable to the
nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d

Cir. 1991).  "Only when reasonable minds could not differ as to
the import of the evidence is summary judgment proper."  Id.

## B. STATUTE OF LIMITATIONS

Defendants contend that Presutti's claims are barred by the
applicable statute of limitations.  "Since Congress did not enact
a statute of limitations governing actions brought under § 1983,
the courts must borrow a state statute of limitations. . . .
The statute to be borrowed is the one that is 'most appropriate,'
. . . or 'most analogous,' . . . so long as it is not
inconsistent with federal law or policy."  Lounsbury v. Jeffries,
25 F.3d 131, 133 (2d Cir. 1994).  The Supreme Court has held
that, "where state law provides multiple statutes of limitations
for personal injury actions, courts considering § 1983 claims
should borrow the general or residual statute for personal injury
actions."  Owens v. Okure, 488 U.S. 235, 249-50 (1989).  With
respect to § 1983 claims in Connecticut, the Court of Appeals for
the Second Circuit has answered "the pivotal question in the
Owens analysis" regarding "what state statute of limitations
applies to unenumerated personal injury claims" by naming Section
52-577 of the Connecticut General Statutes.  Lounsbury, 25 F.3d
at 134; see Walker v. Jastremski, 430 F.3d 560, 562 (2d Cir.
2005).  Section 52-577 provides that "[n]o action founded upon a
tort shall be brought but within three years from the date of the
act or omission complained of."  Conn. Gen. Stat. § 52-577.

-23-

Therefore, in order to prevail on his claims, Presutti's claims[5] must have accrued after October 6, 1995, which is three years prior to the date he filed this suit.  The process of determining when a claim accrues for the purpose of applying the statute of limitations to a § 1983 claim is governed by federal law.  See Veal v. Geraci, 23 F.3d 722, 724 (2d Cir. 1994).  A cause of action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980) (quoting Bireline v. Seagondollar, 567 F.2d 260, 263 (4th Cir. 1977)) (internal quotation marks omitted).  "The reference to knowledge of the injury does not suggest that the statute does not begin to run until the claimant has received judicial verification that the defendants' acts were wrongful. . . . Rather, the claim accrues when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm." Veal, 23 F.3d at 724 (internal quotation marks omitted).

Presutti's claims are barred by the statute of limitations because his claims accrued long before October 6, 1995.  Presutti claims that the City and the State precluded him, and conspired to preclude him, from developing his property as part of the

---

[5] For the purpose of this analysis, the court expresses no opinion regarding whether Presutti had a constitutionally protected property interest.

Beaver Street Project.  Each of the major events described in the
complaint that prevented Presutti from completing his development
took place long before October 6, 1995: (1) the City's
designation of Communidad en Accion as a co-developer in the
Beaver Street Project; (2) the City's modification of the zoning
laws regarding the amount of required parking spaces and the
delay in procuring a variance thereto; (3) the City's
ratification of an amendment to its plans submitted to DOH that
would allow the City to acquire certain parcels of Presutti's
property; (4) DOH's refusal to allow elderly housing as a part of
a PRIME project in Presutti's stead; (5) DOH's insistence that a
non-profit developer undertake the Beaver Street Project; (6)
and, ultimately, DOH's denial of Presutti's PRIME application for
Phase 2, which took place on March 25, 1992.[6]  In March of 1992,
Presutti knew about all the obstacles he had encountered to date,
and he received the final blow to the feasibility of his
development plans when his PRIME application was denied.  Thus,
defendants had taken all the actions that Presutti believes
constituted a deprivation of his rights, with Presutti's full
knowledge thereof, at least three years prior to October 6, 1995.

Presutti contends that his cause of action accrued on
December 13, 1996 when he obtained Pernerewski's May 9, 1996

---

[6] In addition, the DEP proceedings against Presutti's
brother-in-law, to the extent these proceedings may be relevant
to Presutti's claims, was initiated prior to October 6, 1995.

memorandum to Blumenthal stating that "Mr. Presutti was listed in the Bond Commission item as the preferred developer for the project. However, given the tax exempt status of the bonds, it was determined that he could not be the developer. She said a document to that effect was sent to the Department of Housing (DOH), although no copy exists in OPM's files." (Dkt. # 172 Ex. C.) Presutti argues that he was not able to see that the actions taken years prior had been part of a concerted effort to prevent him from participating in the development plan in order to preserve the tax-exempt status of the State bond issue. He states that, by exposing the bond issue as the root of the problem, he was finally able to discern exactly what had happened.

Presutti's argument lacks merit. First, it is the time that defendants took action to violate Presutti's rights that controls when a cause of action accrues; the wrongs were inflicted upon him by 1992 regardless of when Presutti decided that he possessed enough information to begin legal proceedings. Second, even if defendants' motives were of critical importance, Presutti had notice of the issue with the tax-exempt bonds in 1992. There is no dispute that, on March 10, 1992, David Martin from DOH told Presutti that the City and DOH had reached an agreement affecting Presutti because of state bond problems, and that, as a result, Presutti would not be able to participate in the Beaver Street

Project.  As such, Presutti could not have discovered anything of critical importance in December of 1996 that he did not already know or have had reason to know.  His claims are therefore barred.[7]

### III. CONCLUSION

For the foregoing reasons, the State defendants' (Cibes, Fusaro, Lusardi, Milano, Papandrea, Pernerewski, Martin, and Scherer) (dkt. # 170), the City defendants' (McNamara, Brochu, DeFronzo, Fusaro, Harrall, Klimek, Blogoslawski, Birden, and Cobb) (dkt. # 167), and Dubno's (dkt. # 163) motions for summary judgment are **GRANTED.**  Judgment shall enter in favor of each defendant on each claim of the complaint.  The Clerk of the Court shall close this file.

So ordered this 13th day of April, 2006.

**/s/DJS**

_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**

---

[7] Presutti's arguments in favor of tolling the statute of limitations period lack merit as a matter of law for the reasons stated by defendants in their memoranda of law.

-27-